UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DENNIS W. QUIRK, Individually and as President of and on
behalf of the NEW YORK STATE COURT OFFICERS
ASSOCIATION,

                                        Plaintiff,


                -against-                                              20-cv-9910 (LAK)


ERIC KATZ, individually and in his capacity as Deputy Chief
Counsel for the New York State Senate, HONORABLE BRAD
HOYLMAN, individually and in his capacity as Chairman of
the New York State Senate Judiciary Committee,
HONORABLE LAWRENCE K. MARKS, in his capacity as
Chief Administrative Judge of the New York State Unified
Court System, HONORABLE JANET DIFIORE, in her
capacity as Chief Judge of the New York State Unified Court
System, and JOHN DOES 1-5,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:


                        Pat Bonanno
                        PAT BONANNO & ASSOCIATES, P.C.
                        *Attorneys for Plaintiff*


                        Shawn Shatzle
                        LETITIA JAMES
                        ATTORNEY GENERAL OF THE STATE OF NEW
                        YORK
                        *Attorneys for Defendants*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/13/2022

LEWIS A. KAPLAN, *District Judge.*

On March 7, 2020, New York declared a statewide disaster emergency in response to the rapidly spreading "novel coronavirus."[1] During the ensuing weeks, hundreds of thousands of New Yorkers would contract COVID-19 as state and federal officials clashed about the severity of and appropriate responses to the outbreak.[2]  By June 1, the state's COVID-19 death toll topped 18,000.[3]

Among the many public-facing institutions immersed in the challenge and controversy of delivering essential services during the nascent pandemic was the New York State Unified Court System ("UCS").  Plaintiff Dennis W. Quirk, a now-retired UCS court officer and still president of the New York State Court Officers Association ("NYSCOA"), brings this action against two judges, a state senator, and a legislative staffer for allegedly defaming and retaliating against him for his "continued vigorous and public objections" to the adequacy of UCS's safety protocols at the pandemic's outset.[4]

Quirk's principal allegation is that defendants irreparably harmed him by "aid[ing],

---

[1]

N.Y. Exec. Order No. 202.

[2]

Corinne N. Thompson, Jennifer Baumgartner, et al., *COVID-19 Outbreak — New York City, February 29–June 1, 2020, Morbidity and Mortality Weekly Report 2020; 69:1725–1729,* U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a2.htm?s_cid=mm6946a2_w (last visited Sept. 10, 2022).

[3]

*Id.*

[4]

Second Amended Complaint (hereinafter "SAC") [Dkt 55-1] ¶ 15; Dkt. 66 at 18.

abett[ing], and adopt[ing] the publication" of a *New York Post* (the "*Post*") story that reported excerpts of an email sent by a group of black court officers to New York's then Chief Judge, Janet DiFiore, complaining of a pattern of "racial inequality and brutality" purportedly fostered by plaintiff as NYSCOA's president (the "June 12 Story").[5]

On this motion to dismiss, the Court is obliged to assume – for the purposes of the motion only – the truth of all of Mr. Quirk's well pleaded factual allegations. It must draw in his favor all inferences that reasonably may be drawn from those allegations. It cannot at this stage of the proceedings entertain any arguments seeking to cast doubt on their veracity, even though defendants would be permitted to make such arguments at a trial.[6] Accordingly, the following factual narrative proceeds from Quirk's own account of the events that transpired, contextualized in some places by materials of which the Court properly may take judicial notice.[7]

---

[5] SAC ¶ 19; Rebecca Rosenberg & Bruce Golding, *Judge Orders Racial Inequality Probe into NYC Court Officers' Union Leader*, N.Y. POST (June 12, 2020, 3:43 PM), https://nypost.com/2020/06/12/racial-inequality-probe-ordered-into-court-officers-union-leader/ (last visited Sept. 10, 2022); *see also* Bruce Golding, *Court Officers' Union Boss Accused of Calling Black Judges 'Monkeys'*, N.Y. POST (June 16, 2020, 7:00 AM), https://nypost.com/2020/06/16/court-officers-union-boss-accused-of-calling-black-judges-monkeys/ (last visited Sept. 10, 2022).

[6] *E.g., Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015) ("On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor.").

[7] *See Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020) (holding that the court could consider the full contents of a news article – including those portions not cited in the complaint – because the complaint's "clear, definite and substantial reference to" that article incorporated it by reference) (quoting *Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 537 (S.D.N.Y. 2018)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

### Facts

*Quirk's Pre-COVID FOIL Requests*

Although most of Quirk's allegations center on purported retaliation for "continued vigorous and public objections to the complete failure of Defendants . . . to provide a safe working environment" during the initial COVID-19 outbreak, his complaint in some places suggests retaliation for pre-COVID speech.  It notes that Quirk, in his capacity as NYSCOA president, began submitting New York Freedom of Information Law ("FOIL") requests in late 2018 "seeking the lawful production of documents regarding the budget and expenditures of the New York State Court of Appeals and the Office of Court Administration."[8] Exhibits to the complaint indicate that Quirk sought records pertaining to a wide range of topics, including "renovations to the chief judge's office," "renovations to the chief judge's home," "vehicles assigned to the court of appeals," and "food and beverages purchased by the court of appeals on site and off site."[9] Contemporaneous news articles indicate that Quirk's ongoing public spat with Chief Judge DiFiore in the press also dates back to late 2018 – and encompasses a range of subject matter far beyond the FOIL requests or UCS's courthouse safety measures during COVID.[10]  In any event, Quirk brings no FOIL claims as

---

[8]    SAC ¶ 14.

[9]    SAC, Ex. 1 [Dkt 1-1] at 15-27. Exhibits 1-15, which Quirk refer to in the SAC, appear on the docket only as attachments to the original complaint. Dkt 1. They are supplemented by Exhibits 16-18, which Quirk added as attachments to the Second Amended Complaint without reattaching Exhibits 1-15. Dkt 56.

[10]    *See, e.g.,* Rebecca Rosenberg, *Judge Blasts Court Officer Union Boss for 'Offensive' T-Shirts*, N.Y. POST (Oct. 31, 2018, 6:47 PM), https://nypost.com/2018/10/31/judge-blasts-court-officer-union-boss-for-offensive-t-shirts/

part of this action, nor does his second amended complaint allege any response to those inquiries.

*Quirk Objects to the Judiciary's Initial Response to COVID-19 Outbreak*

On March 13, 2020, the two judicial defendants in this case, Chief Judge Janet DiFiore and Chief Administrative Judge ("CAJ") Lawrence K. Marks[11] (the "Judicial Defendants"), announced new courthouse operations procedures to reduce traffic, postpone trials, and enable remote proceedings so as to curtail the spread of COVID-19.[12] On March 15, the judiciary postponed indefinitely all non-essential court functions.[13]

The next day, nine days into New York's state of emergency, Quirk wrote a letter to Chief Judge DiFiore proclaiming "a severe shortage of hand sanitizer, paper towels, masks, and no wipes [sic] to clean and sanitize the x ray machines, magnetometers, locker rooms etc. . . . Also, the court buildings are not cleaned properly."[14] To that letter he attached a March 12 email he had sent

---

(last visited Sept. 10, 2022); Brendan J. Lyons, *State Court Officers Seek Independent Investigation of OCA*, TIMES UNION (Aug. 22, 2018, 6:33 PM), https://www.timesunion.com/news/article/State-court-officers-seek-independent-131721 93.php (last visited Sept. 10, 2022); *see also Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents[.]") (emphasis omitted).

[11]

According to the SAC, CAJ Marks "is responsible for implementing and enforcing the Rules of the Chief Judge" and "charged with overseeing and evaluating policies that address safety measures related to the spread of COVID-19 in state courthouses." SAC ¶ 9.

[12]

*See* Dkt 24-3, *Quirk v. DiFiore*, No. 20-CV-5027 (JPO) (S.D.N.Y.) ("*Quirk I*").

[13]

*See* Dkt 24-4, at 2. *id.*

[14]

SAC, Ex. 1 [Dkt 1-1], at 29.

6

to roughly a dozen court personnel to announce the following:

> "There is a shortage of hand sanitizer, paper towels and masks . Locker rooms are not being cleaned PROPERLY EVERY DAY AND COURT ROOMS ARE [sic] BEING CLEANED PROPERLY.  Also 9 Family court officers were just sent home today to see a doctor because they were exposed to someone with the virus . Who is going to pay their medical bill . [sic] Dennis[.]"[15]

New York's courts remained largely shuttered until the early summer, reopening gradually pursuant to new safety guidelines mandating the use of face masks, social distancing, and daily temperature checks, among other measures.  The reopening protocols were announced in a series of memoranda from May to July 2020.[16]

*The UCS Racial Inequality Investigation and the* New York Post *Stories*

On June 12, 2020, the *Post* reported that Chief Judge DiFiore had ordered an investigation into allegations of "'racial inequality and brutality' against black court officers."[17] The June 12 Story centered on an email (the "Officers' Email") "signed by three black Brooklyn court officers . . . who said they were writing on behalf of the 42 black court officers assigned to Brooklyn criminal court" to Chief Judge DiFiore.[18] As reported in the article, the Officers' Email "called [Quirk], longtime president of [NYSCOA], 'a safe haven for racist speech and actions'" and

---

[15] *Id.* at 30.

[16] See Dkt 24, *Quirk v. DiFiore*,  No. 20-cv-5027 (JPO) (S.D.N.Y.).

[17] Rebecca Rosenberg & Bruce Golding, *Judge Orders Racial Inequality Probe into NYC Court Officers' Union Leader*, N.Y. POST (June 12, 2020, 3:43 PM), https://nypost.com/2020/06/12/racial-inequality-probe-ordered-into-court-officers-union-leader/ (last visited Sept. 10, 2022).

[18] *Id.*

described how he "ha[d] on many occasions used racist dog whistles against anyone who dare[d] to oppose him[.]"[19]  The story purported to quote from the email itself in several places, including from one portion alleging that court officers "who ha[d] spoken out about racial inequality and brutality ha[d] been retaliated against by forced transfers and . . . minuscule or fabricated disciplinary charges . . . ."[20]  The June 12 Story reported also that Chief Judge DiFiore "wrote back and said she was forwarding their complaints" to an independent investigator whom she previously had announced would be reviewing "'[t]he New York State court system's response to issues of institutional racism' in the wake of the police killing of George Floyd," whose then-recent murder had sparked public demonstrations nationwide.[21]

Four days later, the *Post* ran a second article about Quirk (the "June 16 Story") .  The June 16 Story, titled *Court Officers' Union Boss Accused of Calling Black Judges 'Monkeys'*, referred to allegations in a now-settled 2017 civil case against Quirk by a Manhattan court officer who claimed to have been unfairly denied promotions as a result of Quirk's racism.[22]  The June 16

---

[19]

    *Id.*

[20]

    *Id.*

[21]

    *Id; see In Re New York City Policing During Summer 2020 Demonstrations*, No. 20CIV8924 (CM) (GWG), 2022 WL 203191, at *1 (S.D.N.Y. Jan. 24, 2022), *aff'd sub nom. In re New York City Policing During Summer 2020 Demonstrations*, No. 20-CV-8924 (CM) (GWG), 2022 WL 656808 (S.D.N.Y. Mar. 4, 2022) ("On May 25, 2020, a Minneapolis Police Department officer murdered George Floyd, an individual who had been placed under arrest.  Nationwide protests followed, including in New York City, where the volume and geographic spread of [the demonstrations] were unprecedented.") (citations and internal quotation marks omitted).

[22]

    Bruce Golding, *Court Officers' Union Boss Accused of Calling Black Judges 'Monkeys'*, N . Y .   P O S T   ( J u n e   1 6 ,   2 0 2 0 ,   7 : 0 0   A M ) , https://nypost.com/2020/06/16/court-officers-union-boss-accused-of-calling-black-judges

Story briefly referenced the June 12 Story to note only that the *Post* already had "revealed that state Chief Judge Janet DiFiore ordered a probe into allegations by three black Brooklyn court officers that Quirk was a 'safe haven for racist speech and actions[.]'"[23] The second article did not include any new details about the newly opened investigation.

Quirk alleges that the Judicial Defendants "aided, abetted and adopted the publication of false, defamatory and injurious allegations by the New York Post newspaper" on or about June 12, 2020 "continuing through on or about June 16, 2020."[24] In substance, he alleges that the Judicial Defendants "supplied 'confidential information' to the [*Post*] . . . claiming [Quirk] engages in 'racial inequality and brutality'"[25] while noting Quirk's "disbelief and outrage at [Chief Judge DiFiore's] alleged dissemination of false, defamatory and injuries allegations."[26] The most specific allegation is that certain sworn testimony given by nonparties to this action at Quirk's April 28, 2021 disciplinary hearing, discussed below, suffices to "remove[] any 'speculation' or 'conjecture' that the Judicial Defendants . . . published the false, defamatory, and injurious allegations reported by the *Post*."[27] Most notably, he alleges that OCA's General Counsel testified during the misconduct proceedings that a *Post* reporter had told him that Chief Judge DiFiore had "made th[e] claim" that

---

[23]     -monkeys/ (last visited Sept. 10, 2022).

     *Id.*

[24]     SAC ¶ 19.

[25]     *Id.* ¶ 18.

[26]     *Id.* ¶ 23.

[27]     *Id.* ¶ 40.

Quirk was "a racist" and that she had been responsible for "releas[ing] an email [DiFiore] received on June 11 and . . . [her] response to the email" to the paper.[28]   Additionally, the second amended complaint points to a portion of Quirk's own testimony in which he identifies a portion of a letter by Court Officer Michael Jones suggesting that the email referenced in the June 12 Story was "made public by Chief Judge Janet DiFiore."[29]

*Quirk's June 12 Email & The Misconduct Investigation*

Soon after the June 12 Story went live, Quirk "sent a private email to Defendant DiFiore expressing disbelief and outrage at her alleged dissemination of false, defamatory, and injurious allegations directed at Plaintiff to the New York Post newspaper."[30]   According to documents that Quirk attached to the complaint, his June 12 email to Chief Judge DiFiore included the following admonition: "[L]et's see have [sic] you like the online articles about your relationship with a police officer with ties to organized crime while you were married posted all over every court building in NYS."[31]   Quirk alleges that Chief Judge DiFiore responded by initiating two separate investigations.   He alleges that she initiated (1) "an Inspector General's (IG) investigation of

---

28

*Id.* ¶ 42A.   Quirk's second amended complaint skips from paragraph 40 to paragraph 42. It then makes allegations in three consecutive paragraphs that are each numbered "42." The Court refers to those three paragraphs in order as paragraphs 42A, 42B, and 42C, respectively.

29

*Id.* ¶ 42B.

30

*Id.* ¶ 23.

31

*Id.*, Ex. 7 [Dkt 1-7], at 4.

10

[Quirk's] . . . protected speech"[32] and (2) a pretextual "racial inequality" investigation – both "on or about June 12," the same day as the initial *Post* article.[33]  The June 12 Story, of course, already had reported the appointment of a Special Adviser on Equal Justice in the New York State Courts (hereinafter "Special Adviser") to conduct an independent racial inequality investigation, which the judiciary had announced via press release on Tuesday, June 9, 2020.[34]

*Quirk's First Lawsuit*

On July 1, 2020, Quirk filed a suit similar to this one in this Court ("*Quirk I*") in which he alleged that Chief Judge DiFiore and the New York Office of Court Administration ("OCA") "undertook a course of conduct under color of state law to silence [Quirk] by threatening him with and subsequently filing a disciplinary action against him [] arising from [his] numerous [FOIL] requests."[35]  Quirk moved thereafter for a temporary restraining order and preliminary injunction against Chief Judge DiFiore and CAJ Marks in an attempt to halt enforcement of the judiciary's COVID-19 screening measures.[36]  That motion insisted that the Judicial Defendants' "full

---

[32]   *Id.* ¶ 24.

[33]   *Id.* ¶¶ 24-26.

[34]   *See* Press Release, *Aiming to Advance Equal Justice in the Courts, Chief Judge DiFiore Announces Independent Review of Court System Policies, Practices and Initiatives*, N.Y. S T A T E   U N I F I E D   C O U R T   S Y S T E M   ( J u n e   9 ,   2 0 2 0 ), https://www.nycourts.gov/LegacyPDFS/press/pdfs/PR20_24.pdf (last accessed Sept. 10, 2022).

[35]   SAC ¶ 14; *see Quirk I*, No. 20-cv-5027 (JPO) (S.D.N.Y.).

[36]   *Quirk I*, No. 20-cv-5027 (JPO), 2020 WL 7260533, at *2 (S.D.N.Y. Dec. 10, 2020).

throttle, head-long intent on opening courthouses upon a false sense of security" amounted to "callous disregard for the health and safety" of NYSCOA members.[37]  However, it simultaneously posited that the proposal to condition courthouse entry on health screening might "very likely lead to a denial of due process for litigants and lawyers"[38] while nodding to a suggestion that the virus may not be "real."[39] The Court, per Judge Oetken, denied that motion in all respects.[40]

The complaint in *Quirk I* advanced a range of constitutional and statutory claims against the judicial defendants that overlap considerably those at issue on this motion, including alleged retaliation for "Quirk's consistent objections about . . . COVID-19 protocols . . . and his previous FOIL requests," as well as Section 1983 conspiracy.[41]   *Quirk I* differs from this case principally in that it did not involve the *New York Post* stories, the Special Adviser's racial inequality investigation, or claims against the legislative defendants that feature prominently here.[42] Regardless, the Court, again per Judge Oetken, previously dismissed *Quirk I* in its entirety.[43]

---

[37]     SAC, Ex. 2 ¶ 11.

[38]     *Id.* ¶ 12.

[39]     *Id.* ¶ 14.

[40]     *Quirk I*, 2020 WL 7260533, at *2.

[41]     *Quirk I*, No. 20-cv-5027 (JPO), 2022 WL 268976, at *1 (S.D.N.Y. Jan. 28, 2022).

[42]     *Id.* at *5.

[43]     *Id.*

*The Misconduct Proceedings*

On August 4, 2020, OCA issued a Specification of Charges informing plaintiff that he had been "charged with misconduct" pursuant to Article 24 of the UCS-NYSCOA collective bargaining agreement.[44]  It charged Quirk in two specifications, both of which stemmed from the June 12 "threatening email to Chief Judge DiFiore designed to intimidate her." [45]  Together, the specifications alleged that Quirk's email violated Part 50 of the Rules of the Chief Judge as well as the standards set out in the UCS Court Officers Rules and Procedures Manual.  OCA's Specification of Charges – which Quirk attached to the complaint – says nothing of his COVID-related comments, the pending racial inequality investigation, or any allegations appearing in the *Post* articles.  Quirk subsequently appeared before a Judicial Hearing Officer for a disciplinary hearing on April 28, 2021, but the second amended complaint does not indicate a final disposition as to either specification.[46]

*Quirk Not Invited to Testify at Legislative Hearing*

The legislative defendants in this case are Eric Katz, deputy chief counsel for the New York State Senate Majority, and Brad Holyman, a New York State Senator representing the 27th District and chair of that body's Judiciary Committee.[47]  Quirk's claims against the legislative defendants stem from a "Joint Virtual Public Hearing to examine the Re-Opening and Operation of

---

[44]      SAC, Ex. 7 [Dkt 1-7], at 3.

[45]      *Id.* at 4.

[46]      SAC, Ex. 17 [Dkt 56-2], at 1.

[47]      SAC ¶¶ 7-8.

New York's Courts during the Covid-19 Pandemic" held on August 21, 2020.  According to the second amended complaint, Mr. Katz was responsible for vetting prospective live witnesses whom Senator Holyman ultimately would approve or deny.[48]

As detailed in the complaint, Katz telephoned union lobbyist and New York State Public Employee Conference (NYSPEC) chairman Peter Meringolo on or about August 18, 2020 seeking recommendations regarding whom the Senate should invite to testify about courthouse operations.  Plaintiff was among the several persons Meringolo recommended.  In response to that recommendation, Katz allegedy "rebuked Mr. Meringolo's suggestion that Dennis Quirk be afforded an opportunity to . . . enlighten the legislature with his forty-six (46) years of knowledge," explaining that Quirk's live participation "would be a problem based upon recent allegations and accusations that appeared in the Post" and adding that "the powers to be do not think it would be a good idea to invite Dennis Quirk."[49]

Katz then suggested that Meringolo ask Quirk if someone else from NYSCOA might testify at the hearing on the union's behalf.  In an August 19 email attached to the second amended complaint, Katz explained further that the "allegations or investigations against [Quirk] have given us pause, and we believe his participation would be a distraction as a result of our attempt to gain information about court reopening issues from a wide range of stakeholders."[50]  Katz thereafter indicated that the legislature would not be "extend[ing] an invitation to [NYSCOA] to appear" at the

---

[48]      *Id.*

[49]      *Id.* ¶ 30.

[50]      *Id.*, Ex. 11 [Dkt 1-11].

hearing on the understanding that Quirk "did not wish to have anyone else participate" on that organization's behalf.[51]  Meringolo's reply email, which indicates that Quirk was or had been one of Meringolo's clients, implored Katz to reconsider his "huge mistake," concluding with the following admonition:

> "Union leaders will not be bullied into silence.  Perhaps Eric [Katz] you really do not know anything about me or my reputation.  You might want to do some checks on your own. . . . Stay Safe[,] Peter D. Meringolo."[52]

Quirk's allegations indicate that he did not testify at the virtual hearing, which was live-streamed to the public and posted online.[53]


*The Special Adviser's Report*

　　　　The Special Adviser released a report several months later, on October 1, 2020.  Although it apparently did not identify Quirk by name, it concluded that NYSCOA's "leadership," and specifically, an individual "who has been president of that union for 46 years," indeed had been a "safe haven for racist speech and actions" – mirroring the phrase used to describe Quirk in the Officers' Email as reported in the *Post*.[54]  However, Quirk does not allege any formal sanction resulting from the Special Adviser's findings or the conduct detailed therein, nor does he identify any actions whatever by the defendants subsequent to the report's publication.  Indeed, the only

---

[51]
　　*Id.*

[52]
　　*Id.*, Ex. 12 [Dkt 1-12].

[53]
　　*NYS Senate Public Hearing: News York's Courts During The COVID-19 Pandemic*, YOUTUBE(Aug. 21, 2020), https://www.youtube.com/watch?v=GwqI4paybis.

[54]
　　SAC, Ex. 8 [Dkt 1-8], at 1

notable actions or events referenced in the complaint that even arguably post-date the Special Adviser's findings are (1) Quirk's demand for records from the New York State Senate – which was denied on October 29 on the ground that such communications "are not subject to disclosure pursuant to Senate Rules" – and (2) the April 28, 2021 disciplinary hearing, which concerned the misconduct specifications filed on August 5, 2020 and for which no disposition is alleged.[55]

*The Present Action*

Plaintiff filed the present action on November 24, 2020 and amended his initial Complaint on December 24, 2020.[56] He filed a second amended complaint on October 26, 2021.[57] His pleading makes clear that Mr. Quirk here sues the legislative defendants in both their individual and official capacities and the Judicial Defendants only in their official capacities. With respect to both sets of defendants, he seeks compensatory and punitive damages for alleged deprivations of "rights to free speech and freely associate [sic] with others," as well as for "libel and or slander."[58] He claims that both he and NYSCOA have "been injured in their good name and reputation," "suffered emotional distress, humiliation, and conscious pain," and "been caused to suffer great pain and mental anguish" on account of the judicial defendants' "attempt[] to effectively remove him from office" and the legislative defendants' "decision to deny Mr. Quirk's appearance" at the

---

[55]  SAC ¶¶ 37-40.

[56]  Dkt. 20.

[57]  Dkt. 59.

[58]  SAC ¶¶ 49-59.

hearing.[59]

Defendants now move to dismiss Mr. Quirk's official capacity claims for lack of subject matter jurisdiction and the remainder of the second amended complaint for failure to state a claim upon which relief can be granted.

## *Discussion*

*Legal Standard*

A case must be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it."[60]  Absence of subject matter jurisdiction cannot be waived or forfeited and may be challenged at any time.[61]  The party asserting subject matter jurisdiction has the burden of proving its existence.[62]  Through the Eleventh Amendment, the doctrine of sovereign immunity extends "not only to a state, but also to entities considered 'arms of the state.'"[63]  Absent a waiver, sovereign immunity "bars the award of

---

[59]
    *Id.* ¶¶ 15, 32, 46-48.

[60]
    *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).

[61]
    *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

[62]
    *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011).

[63]
    *Clissuras v. City Univ. of New York*, 359 F.3d 79, 81 (2d Cir. 2004) (quoting *McGinty v. New York*, 251 F.3d 84, 95 (2d Cir.2001)).

monetary damages against state officials in their official capacities."[64]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."[65]  This standard is met where the "pleaded factual content," which on this motion must be assumed to be true, permits a "reasonable inference that the defendant is liable for the misconduct alleged."[66]

A complaint need not "anticipate potential affirmative defenses" or "affirmatively plead facts in avoidance of such defenses."[67]  However, the Court may dismiss on the basis of an affirmative defense "if the defense appears on the face of the complaint."[68]

*No Facts Pled as to "John Does 1-5" or Harms to NYSCOA*

The Court notes at the outset that Quirk has not alleged any specific facts about the five supposed "John Doe" defendants, whose alleged involvement in the underlying events is indistinguishable from what is alleged against the named defendants.  Simply put, there is nothing in the complaint capable of aiding in identifying any "John Does" or supporting any claim against them were they identified.

---

[64]

    *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022); *see Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017).

[65]

    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[66]

    *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[67]

    *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007); *see Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 315 (S.D.N.Y. 2014).

[68]

    *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

NYSCOA is not a a party to this case.  Nor does the complaint allege facts suggesting that Quirk properly brings any claims on its behalf.  To begin with, it is entirely unclear whether Mr. Quirk imagines such claims to proceed on behalf of the union in its organizational capacity or on behalf of the approximately 1,500 individuals who comprise NYSCOA's membership.[69]  The plain language of the second amended complaint suggests the latter, since it contends, for example, that "[p]laintiffs have . . . suffered emotional distress, humiliation, and conscious pain and suffering"[70]  Tellingly, however, the entire portion of the second amended complaint detailing the four causes of action contains no reference to pluralized "plaintiffs" and instead requests relief only for Mr. Quirk individually.  Even if the Court had a duty to construe his claims as proceeding on behalf of NYSCOA or its members – which it does not – it could not do so on a pleading as vague as this one. Every fact, event, and injury alleged in the second amended complaint centers on Mr. Quirk himself. Accordingly, the only discernible claims here are by Mr. Quirk individually against four named defendants.

*The Court Lacks Subject Matter Jurisdiction over Mr. Quirk's "Official Capacity" Section 1983 Claims*

Quirk brings Section 1983 claims against both sets of defendants in their official capacities, although it is plain that no "official capacity" Section 1983 claims can proceed here

---

[69]

SAC ¶ 4.

[70]

*Id.* ¶ 47.  Through his memorandum of law in opposition to the motion, Quirk toggles between "plainitiff" and "plaintiffs," referring to both "Plaintiff Court Officers" and "Plaintiff Union."  Dkt 66, at 1-2.

substantially for the reasons Judge Oetken illuminated in *Quirk I*.[71] Quirk seeks no injunctive relief in this case. All of his Section 1983 claims are against state officers for monetary damages and therefore barred by the Eleventh Amendment to the extent they proceed against any named defendant in his or her official capacity.

### *Individual Capacity Section 1983 Claims*

#### *Judicial Defendants*

Despite the fact that the second amended complaint makes clear that plaintiff sues legislative defendants in their personal and official capacities but the Judicial Defendants only in their official capacities, his memorandum of law – under the heading pertaining to "First Amendment Claims Against Judicial Defendants" – suggests that all "defendants herein have been sued in both their official and individual capacities."[72]

It is "axiomatic" that a plaintiff cannot amend his complaint through briefing in opposition to a motion to dismiss. Accordingly, there is no cognizable individual capacity claim here against the Judicial Defendants. But in the interests of avoiding an unnecessary attempt to amend the second amended complaint, the Court notes that any such individual capacity Section 1983 claims against the Judicial Defendants necessarily would fail.[73]

First, and most obviously, Quirk has failed to allege adequately any adverse

---

[71]      *Quirk I*, No. 20-cv-5027 (JPO), 2022 WL 268976, at *2-*3 (S.D.N.Y. Jan. 28, 2022).

[72]      Dkt 66, at 15.

[73]      *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

employment action.[74]  It is well established that "investigations and threats of disciplinary action are

generally not, standing alone, sufficient to plead an adverse employment action" within the context

of a First Amendment retaliation claim.[75]  This is especially so when "the investigations or charges

at issue did not result in subsequent employment consequences" beyond possible reputational

injury.[76]  This is true even where a public employer has caused the employee to be "stigmatized by

being subjected to an unwarranted *criminal* investigation" and where the employer "institute[d] the

. . . investigation maliciously."[77]  Indeed, in *Yerdon v. Henry*,[78] the Circuit explicitly held that the

filing of disciplinary charges "did not constitute retaliation because the charges had not yet been

adjudicated and that, if the charges were ultimately dismissed, [the plaintiff] would not have suffered

any adverse effect from them."[79]

---

[74]

    *Shara v. Maine-Endwell Cent. Sch. Dist.,* No. 20-2068, 2022 WL 3452280, at *2 (2d Cir. Aug. 22, 2022) ("To make out a 'prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" (citation omitted); *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (holding that a plaintiff pursuing a First Amendment retaliation claim against representatives of his or her government employer "must demonstrate that: '(1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination'") (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003)).

[75]

    *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 266 (S.D.N.Y. 2006) (collecting cases).

[76]

    *Id.; Boylan v. Arruda*, 42 F. Supp. 2d 352, 356-58 (S.D.N.Y. 1999).

[77]

    *Boylan*, 42 F. Supp. 2d at 358 (emphasis added).

[78]

    91 F.3d 370 (2d Cir. 1996).

[79]

    *Yerdon*, 91 F.3d at 378.

Here, Mr. Quirk has failed to allege any disposition of his disciplinary charges or any action whatever by the Judicial Defendants stemming from the misconduct investigation or the Special Adviser's report.  Nor does the specter of some future adverse employment action support Quirk's retaliation claim, as the Circuit requires that the employee already have "suffered an adverse employment action."[80]  Of course, as defendants point out in their papers, any possibility of some future adverse action already "has been extinguished because Quirk has retired from UCS," and Quirk nowhere has alleged that he suffered an adverse action prior to or in connection with his retirement.  Nor has he alleged that he intends to seek reinstatement or that he possesses a unilateral right to come out of retirement.

What is more, the complaint fails to allege plausibly that either investigation was motivated by Mr. Quirk's FOIL requests or "continued vigorous and public objections to the complete failure of Defendants . . . to provide a safe working environment" during the COVID-19 pandemic as he claims.  Quirk must plead a causal connection "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."[81]  Put differently, a plaintiff does not sufficiently allege causation where it is "just as

---

[80]  *Cobb v. Pozzi,* 363 F.3d 89, 102 (2d Cir. 2004) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir.2003)).

[81]  *Preschools of Am. (USA), Inc. v. New York City Dep't of Educ.*, No. 17-CV-5027 (RA), 2018 WL 4265886, at *4 (S.D.N.Y. Sept. 6, 2018) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)).

plausible" that the defendants' actions were motivated by a lawful reason.[82]

Here, Mr. Quirk concedes that he sent his "private email" to Chief Judge DiFiore shortly after learning of the June 12 *New York Post* story.[83]  He even attached to his complaint the portion of OCA's statement of misconduct charges against him that quotes from relevant portions of that email.  Moreover, both of Quirk's misconduct specifications were circumscribed entirely by the purportedly "disrespectful and threatening email" he sent to the Chief Judge on June 12, 2020.  It would be an understatement to say that it is at least as plausible that Mr. Quirk was investigated and charged for attempting to intimidate the state's highest judicial officer than for his COVID-related comments or any combination of other reasons nowhere mentioned in the charging document.  The same goes for the Special Adviser's investigation, particularly in light of its timing, the conduct alleged in the Officers' Email, and the nature of the allegations previously made against Quirk in the 2017 civil case.

Because Mr. Quirk's potential - - but as yet unasserted - - individual capacity Section 1983 claims against the Judicial Defendants plainly would be deficient with respect to adverse employment action and causation, the Court need not reach any of the other foreseeable problems with those claims, such as whether Quirk plausibly has alleged any constitutionally protected speech, the lack of facts suggesting these defendants' personal involvement in the disciplinary process, or the possible availability of qualified immunity on the face of the complaint.

---

[82]      *Old St. George's LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010).

[83]      SAC ¶ 23.

*Legislative Defendants*

Mr. Quirk's individual capacity Section 1983 claims against the legislative defendants take us from implausible to frivolous. Quirk appears to believe that the Constitution entitles him to "enlighten the legislature with his forty-six (46) years of knowledge" whenever New York's elected lawmakers decide to take up a matter of court administration.[84] As much as Mr. Quirk might like to imagine that he can dictate whom New York's Senators invite to testify at their hearings, the notion that he suffered a constitutional injury because they left him out is fantasy. Mr. Quirk has "no constitutional right to force the government to listen to [his] views," much less at whatever time and in whatever forum he pleases.[85]

What is more, that these two defendants are entitled to legislative immunity appears on the face of the complaint. Mr. Quirk does not allege that either Mr. Katz or Senator Holyman was acting outside the sphere of legitimate legislative activity. Nor could he. Selecting and inviting witnesses for a virtual legislative hearing on public health and safety amid COVID-19 plainly is within the sphere of legitimate legislative functions. Accordingly, legislative immunity shields both Mr. Katz and Senator Holyman from liability here.[86]

---

[84]     Dkt 66, at 4.

[85]     *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984); *see Weaver v. New York City Hous. Auth.*, No. 19-CV-10760, 2019 WL 7116141, at *5 (S.D.N.Y. Dec. 20, 2019) (dismissing a claim where the plaintiffs alleged that NYCHA "violated their First Amendment rights by denying them access to, and participation in," certain meetings, in part because their "right to speak is not infringed when government simply ignores [them] while listening to others") (citations and internal quotation marks omitted).

[86]     *See Gravel v. United States*, 408 U.S. 606, 621 (1972) ("[A]ides should enjoy immunity for helping a Member conduct committee hearings.").

*1983 Conspiracy*

Nor can Mr. Quirk maintain a Section 1983 conspiracy claim without having alleged sufficiently any underlying Section 1983 violation.[87]  Even so, the Court pauses to observe that Mr. Quirk's implication that Senator Holyman and/or Mr. Katz unlawfully conspired with Chief Judge DiFiore and CAJ Judge Marks as part of an "orchestrated effort to impugn [his] integrity" is a textbook example of a conclusory allegation.  It is devoid of any factual support whatever save for an allegation that Mr. Katz at one point remarked to a lobbyist that "the powers that be do not think it would be a good idea to invite Dennis Quirk."[88]  Whatever or whomever those unnamed "powers" might be, nothing about that comment – or anything else in the second amended complaint, for that matter – evinces an agreement between or among any of the defendants here, much less one spanning separate branches of government.

*Defamation Claims*

The defamation claims fare no better.  They obviously are insufficient as against the legislative defendants both because of legislative immunity and because Mr. Quirk has not alleged that Mr. Katz or Senator Holyman published any defamatory statement.  The allegations that Senator Holyman "knew or should have known that the statements . . . were false, defamatory, and injurious"

---

[87]   *Ortiz v. Ledbetter*, No. 19-CV-2493, 2020 WL 2614771, at *6 (S.D.N.Y. May 22, 2020); *see AK Tournament Play, Inc. v. Town of Wallkill*, No. 09–CV10579, 2011 WL 197216, at *4 (S.D.N.Y. Jan.19, 2011) ("Plaintiffs' § 1983 conspiracy claims against all Defendants must be dismissed because Plaintiffs have failed to allege any violation of any cognizable constitutional right."), *aff'd*, 444 F. App'x 475 (2d Cir. 2011) (summary order).

[88]   SAC ¶ 30.

and that defendants "all had an opportunity to prevent the conspiracy to defame" are as irrelevant as they are conclusory.[89]   The complaint details only one instance in which either legislative defendant allegedly referenced or communicated about allegations against Quirk: the exchange between Mr. Katz and Mr. Meringolo.[90]   Mr. Katz's remark that some officials apparently "believe[d] [Quirk's] participation would be a distraction" on account of "some of the information that has been written about in the New York Post and other sources about allegations or investigations" fails to identify, much less adopt or republish, the allegations at issue.

Quirk's defamation claims against the Judicial Defendants similarly are meritless. The first and most obvious problem is that the allegations in the Officers' Email that the judicial defendants allegedly "adopted" are nonactionable opinion.   It is a fundamental principle of First Amendment law that no one can be liable for "expressing their opinion . . . no matter how unreasonable, extreme or erroneous these opinions might be."[91]   Whether a statement constitutes an allegation of fact or opinion "is a legal question for the court" guided by three factors:

> "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to

---

[89]

     *Id.* ¶¶ 42, 45; *see Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) (upholding dismissal of defamation claim on legislative immunity grounds and noting that "whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question").

[90]

     SAC ¶¶ 34-36.

[91]

     *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380–81 (1977).

signal readers or listeners that what is being read or heard is likely to be opinion."[92]

Courts are instructed to take a "holistic approach" to this inquiry.[93] Rather than "sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts . . . .'"[94] In view of the "infinite variety of meanings conveyed by words—depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used[,]" New York law "eschew[s] any attempt . . to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied" and reserves to courts "the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant."[95]

Here, the portions of the Officers' Email reported in the June 12 story accused Mr. Quirk principally of creating a "safe haven" for "racist speech and actions," using "racist dog whistles against anyone who dares to oppose him," and "retaliat[ing] against . . . [those] . . . who [had] spoken out against racial" issues by initiating "minuscule or fabricated" disciplinary charges. Each of those statements is a subjective characterization of the purposes or attitudes motivating of

---

[92]   *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995) (internal alterations and quotation marks omitted).

[93]   *Davis v. Boeheim*, 24 N.Y.3d 262, 270 (2014).

[94]   *Brian*, 87 N.Y.2d at 51 (quoting *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991)).

[95]   *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 291-92 (1986).

action taken by NYSCOA leadership.  On their face, none of them is susceptible to being proved or disproved as a demonstrable fact.

Still more important, however, is the attendant context illuminated by Mr. Quirk's own complaint.  To begin with, the second amended complaint does not allege that Chief Judge DiFiore simply forwarded the Officers' Email to the *Post*.  Rather, it alleges that she released that email *along with her own response*, which explains that the Officers' Email described "concerns" that needed to be forwarded to the Special Adviser for investigation.  Indeed, plaintiff's exhibits show that Chief Judge DiFiore's email response transmitted the allegations to the Special Adviser, who appears on the "cc" line.[96]  Accordingly, the June 12 Story –the headline of which concerns the "investigation" and not the underlying allegations – ultimately reported that Chief Judge DiFiore "wrote back [to the court officers] and said she was forwarding their complaints to [the Special Adviser].[97]

Alluding to the existence of facts in need of investigation – for example, by forwarding the complaining officers' generalized assertion that "there is proof" of Quirk's racial motivations – does not transform the alleged disclosure into mixed opinion defamation.[98]  Plaintiff

---

[96]     *See* SAC ¶ 42A.

[97]     Rebecca Rosenberg & Bruce Golding, *Judge Orders Racial Inequality Probe into NYC Court Officers' Union Leader*, N.Y. Post (June 12, 2020, 3:43 PM), https://nypost.com/2020/06/12/racial-inequality-probe-ordered-into-court-officers-union-leader/ (last visited Sept. 10, 2022).

[98]     *See Brian v. Richardson,* 87 N.Y.2d 46 (1995) (distinguishing between "allegations" and "demonstrable fact" and observing among the contextual factors rendering a printed "allegation" nonactionable that the allegations had been republished "to demonstrate the need for an investigation that would establish the truth or falsity of the charges").

does not assert any defamation claims against the *Post* or the complaining court officers in this action.   The only legally relevant communications here are those he has alleged (1) between defendants and the *Post* and (2) between defendants and the Special Adviser.   In these circumstances, both the content of the statements and the context in which they were transmitted indicate that a reasonable person would not have believed that the Judicial Defendants were conveying fact, however one might read the court officers' published email excerpts in isolation.   The republished statements are nonactionable not simply because "New York courts "have consistently held that terms like 'racist' constitute nonactionable opinion," but because a "holistic" view reveals that Quirk's allegations fail to allege adequately any explicit or implied assertion of demonstrable fact.[99]

Thus, as with other claims at issue on this motion, Mr. Quirk's failure to plead any actionable defamatory statement obviates the need to canvass the full range of problems with the defamation causes of action, including failure to plead with particularity any special damages, *Chapadeau*, the absence of factual material linking any allegedly defamatory statement to CAJ Marks, and, of course, the plain implausability of attributing to Chief Judge DiFiore republication of an email purportedly sent on behalf of at least forty-two people because of unsubstantiated double hearsay testimony at Mr. Quirk's disciplinary hearing.[100]

---

[99]  *Cummings v. City of New York*, No. 19-CV-7723 (CM)(OTW), 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24, 2020).

[100]  *Cf. Gertskis v. New York City Dep't of Health & Mental Hygiene*, No. 07-cv-2235 (TPG), 2008 WL 4449285, at *1 (S.D.N.Y. Sept. 29, 2008) (concluding that "an unsubstantiated, double-hearsay accusation" is insufficient to support even a "plausible inference" of discriminatory intent in the Section 1983 discrimination context).

### *Conclusion*

For the foregoing reasons, defendants' motion to dismiss the second amended complaint [Dkt 64] is GRANTED in all respects.  The Clerk shall enter judgment and close the case.


SO ORDERED.


Dated:        September 13, 2022

_____

Lewis A. Kaplan
United States District Judge